UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| TRAVIS LOGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:12-cv-338-CAN |
| | ) | |
| SABRE MANUFACTURING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**OPINION AND ORDER**

On June 22, 2012, Plaintiff, Travis Logan ("Logan"), filed a complaint against his former

employer, Defendant Sabre Manufacturing, LLC ("Sabre") alleging violations of Title VII of the

Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §2000e *et seq.,* for racial

discrimination, harassment and hostile work environment, and retaliation.  On September 7,

2012, the parties consented to have this case adjudicated by the undersigned.  On May 10, 2013,

Sabre filed its Motion for Summary Judgment.  On June 14, 2013, Logan filed a response. On

June 26, 2013, Sabre filed a reply.  On October 1, 2013, the Court held oral argument on the

motion for summary judgment.  The Court issues the following opinion as discussed below

pursuant to the consent of the parties and 28 U.S.C. § 636(c).

I.      **RELEVANT BACKGROUND**

The following facts are primarily not in dispute.  Where the facts are in dispute, this

Court has determined that the disputes are either not material or has chosen to address such

disputes in the Court's substantive analysis of the issues.

Sabre operates a factory in Knox, Indiana, where it manufactures frac tanks, large

railroad car size tanks used to store liquid hazardous waste.  Sabre maintained extremely high

standards for its welders' performance, requiring functionally flawless welds because even a tiny leak in a tank could be very dangerous. Sabre used a temporary employment agency that referred welders to Sabre for 90-day temporary assignments. Before any referred welder began a 90-day temporary assignment, he had to pass a welding test from which Sabre determined whether to accept the referral and where any acceptable referrals would be placed to work in the factory. Only about 70% of the referred welders passed Sabre's welding test.

Sabre supervisors and managers carefully observed and evaluated referred welders throughout the 90-day assignment. If there were performance deficiencies, Sabre would inform the referred welder and provide training to address the deficiencies. At the end of the 90-day assignment, a team of Sabre supervisors and managers determined whether to offer the referred welder a full-time position with Sabre or to return the worker to the agency. If the team was not unanimous in its decision, Sabre would usually extend the referral's temporary assignment to allow for further evaluation of the referral.

In 2010, the agency returned 55% of the 167 referred welders to the agency for reasons including inability to meet the Sabre's high performance standards, attendance, criminal behavior, job abandonment, drug related issues, insubordination, and company rule or policy violations. Logan numbered among those to whom Sabre did not offer full-time employment upon completion of the 90-day temporary assignment.

On November 10, 2010, Logan began his temporary assignment upon referral from the agency and after passing the welding test. Based on his performance on the welding test, Sabre placed Logan in the "weld out" department. "Weld out" is the final and most critical step in the manufacturing of the tanks because it is where assembly is completed and where the tank is

welded up inside and out to prevent leaking of the hazardous materials that the tanks will hold. Logan was assigned to the second shift where Production Manager Marvin Hurt, Quality Control Managers Jeff James and Robert Bruce, and Second Shift Supervisors Brad Doty and Bryan Rose oversaw Logan's work.

Logan and Hurt agree that Logan performed his job well early in his tenure. However, Logan contends that supervisor Doty "nitpicked" his work almost every day he worked. Doc. No. 25-3 at 4. Then, on December 17, 2010, Doty issued the first warning to Logan verbally citing his bad welds on a tank, poor quality of work, and poor work performance. Doc. No. 20-2 at 17. On January 3, 2011, Hurt evaluated Logan's work as part of the regular agency referral process. In the evaluation report, Hurt stated: "Travis needs to pick his game up or he won't be here much longer. At some point something's got to click!" Doc. No. 20-2 at 16. Based on the company form and grading scale for the evaluation, Logan's work earned him 86 points, which equated to "poor job performance." *Id.* On January 7, 2011, Doty issued a second warning to Logan, this time in writing, based on poor job performance, violations of company procedure, and for walking around doing nothing while on the job. Doc. No. 20-2 at 18. On February 8, 2011, a third warning was issued to Logan because he had rushed his work that night, which led to errors requiring repairs taking 35 minutes with the help of two additional employees. Doc. No. 20-2 at 20; 27-1 at ¶ 4.

Throughout Logan's 90-day temporary assignment, Sabre managers and supervisors worked with Logan to help him improve his work quality like they did with other referrals in whom they found potential despite some shortcomings. James Henry, Third Shift Supervisor, became particularly frustrated with Logan's work after his Third Shift crew checked Logan's

welds during the quality control stage of production. Logan's welds were consistently poor requiring considerable extra work to check, correct, and recheck Logan's work. Logan was even transferred for a short time to the "floors" section, where the demands on welders were less, to refresh his welding skills. His work was good on "floors," and so the company returned him to the "weld out" department within a couple days.

As Logan's 90-day assignment came to an end, Rose wrote a report on February 10, 2011, recommending that Logan be terminated for poor quality of welds despite additional training from the company. Rose stated that multiple supervisors and managers had "worked with Travis on his weld quality, Travis could not or chose not to listen and improve. Very poor quality." Doc. No. 21. Deficiencies in Logan's work included lack of consistent quality of welds and inability to keep up with the pace and process of welding per Sabre guidelines as evidenced by his failure to prepare weld surfaces properly before laying welds, inefficient work flow due to bouncing around from spot to spot, and failure to lay good, penetrating welds. Sabre supervisors and managers Hurt, James, Bruce, and Rose considered Logan's full record and unanimously agreed to return Logan to the agency and not offer him a permanent welding position at Sabre. Logan's termination was effective on February 10, 2011. Logan filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 22, 2011, alleging discrimination based on race and retaliation.

During his 90-day tenure at Sabre, Logan encountered race-based comments and conduct on multiple occasions from co-workers and supervisors. For example, near the time Logan began working at Sabre, a co-worker named Johnny asked Logan if he liked fried chicken. Logan told him he liked both fried chicken and watermelon. Soon thereafter Johnny told Logan

a story about his father beating a black man in Winamac who had a white girlfriend. About the same time, Johnny informed Logan that "we don't play that nigger shit out here" in Knox, Indiana. Doc. No. 20-3 at 7. There is no record in Logan's personnel file that he reported these comments to any Sabre authority. Separately, a co-worker named Lars Gustafson made racist comments to show Logan that he was personally opposed to interracial relationships that produce bi-racial children like Logan's. Gustafson also made racial jokes that Logan found to be "stupid." Again, nothing in Logan's personnel file shows that Logan notified any Sabre authority about Gustafson's conduct.

While Logan was working at Sabre, graffiti was found in the bathroom including racial slurs and epithets, union campaign messages, and derogatory statements regarding Plant Manager Jason Ries. Logan knew about the graffiti, but did not report it "because everyone knew about it." Doc. No. 20-3 at 11. Even without Logan's report, Manager Hurt found the graffiti and had it promptly removed. Company investigations never determined who the graffiti artist was, but the company continued to remove it each time it returned. Logan also observed confederate flags displayed on vehicles in Sabre's parking lot. Logan did not report this to Sabre authorities either. Another race-based incident developed when a co-worker arrived wearing clothing displaying a swastika and a steel swastika was displayed in the work bay next to Logan's. Sabre authorities learned of the swastika displays and had them removed from the workplace.

Logan also overheard Manager Hurt referring to "nigger rap music" on a couple of occasions when he entered the Sabre break room. Another co-worker, Shawn Stout, claims to have heard Hurt and Manager James use racial slurs in referencing African American and

Hispanic employees. Stout also witnessed other employees using racial slurs to describe Logan and making threats. Logan even told Stout that he was afraid to be living in the area as an African American and stayed at Stout's home overnight on occasion to avoid returning to his motel alone. Despite his concerns, Logan never reported any of these incidents to Sabre authorities.

The most serious incident that Logan encountered involved two co-workers, named Trigg and Pachowicz, who directed racial epithets at Logan, turned off Logan's welding machine, and rocked a tank while Logan was welding inside the tank on January 20, 2011. Logan's equipment had been similarly turned off before, but he could never identify the culprits because he was wearing his welder's hood. On January 21, 2011, however, Supervisor Rose reported the incident to Hurt who interviewed Logan, Trigg, and Pachowicz. Based on the interviews, Hurt contacted Ries and Human Resources Manager Linda Craig about the situation. Ries then personally interviewed Logan, Trigg, and Pachowicz and determined that the conduct was race-based and incompatible with Sabre's anti-discrimination and anti-harassment policy. Trigg and Pachowicz were fired within two working days of the incident. Ries also met personally with Logan a second time to reassure him that Sabre would not tolerate such conduct and to encourage him to report any questionable future conduct directly to him or Linda Craig.

Logan believes that all these race-based incidents created distractions from his work that affected his work performance at Sabre. However, Logan also stated in his deposition more than once that he did excellent work at Sabre. Logan lacked faith that Sabre management, including Ries, would address race-based discriminatory and harassing conduct meaningfully if he reported more incidents to them. Logan even felt ostracized by other Sabre employees after

Trigg and Pachowicz were fired sensing that no one wanted to get close to him for fear of being fired.

Perceiving a race-charged work environment that affected his ability to succeed and led to his termination, Logan filed his Charge of Discrimination alleging discrimination based on race and retaliation with the EEOC and subsequently his complaint in this Court after receiving a Right to Sue letter from the EEOC. Sabre now seeks summary judgment on Logan's racial discrimination, retaliation, hostile work environment, and First Amendment claims.

## II. ANALYSIS

### A. Summary Judgment Standard of Review

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the nonmoving party as well to draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir. 1999).

To overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings. Rather, the nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Where a factual record taken as a whole could not lead a

rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words,

"[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment

in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to

accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th

Cir. 2005) (quotations omitted).

      **B.**    **Logan's First Amendment claim fails as a matter of law because Sabre is not a state actor.**

In his complaint, Logan alleges that Sabre unlawfully retaliated against Logan when it

terminated him less than one month after Logan complained to Hurt about continuous and severe

racial harassment in the plant. In addition to his straight Title VII claim for retaliation, Logan

asserts that his First Amendment rights were violated by this retaliation. However, "[t]he

Fourteenth Amendment, and, through it, the First and Fifth Amendments, do not apply to private

parties unless those parties are engaged in activity deemed to be 'state action.'" *Nat'l Broad.*

*Co., Inc. v. Commc'ns Workers of Am., AFL-CIO*, 860 F.2d 1022, 1024 (11th Cir. 1988) (citing

*Jackson v. Metro. Edison Co.,* 419 U.S. 345, 349 (1974)). At the oral argument on October 1,

2013, Logan conceded that there is no state action in this situation to justify the First

Amendment claim. Therefore, Logan's First Amendment claim fails.

      **C.**    **Logan's Title VII racial discrimination and retaliatory discharge claims fail as a matter of law.**

Logan contends that his termination constituted unlawful race discrimination and

retaliation in violation of Title VII. Title VII prohibits employers from discharging any

individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.

§ 2000e-2(a)(1).  In addition, Title VII prohibits an employer's retaliation against his employee because he " . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . ." under Title VII.  42 U.S.C. § 2000e-3(a).  Logan proceeds using the indirect method, or burden-shifting approach, used in *McDonnell Douglas Corp. v. Green* in his attempt to establish his claims of race discrimination and retaliatory discharge under Title VII.  *See* 411 U.S. 792, 802 (1973); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007).

To establish a *prima facie* case of discrimination or retaliation by the indirect method, an employee must show that (1) he was a member of a protected class, (2) he was meeting the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the employer treated a similarly situated employee not in the protected class more favorably.  *Fane*, 480 F.3d at 538.   Once the employee establishes a *prima facie* case of discrimination, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Id.*  After the employer satisfies its burden of production, the employee must prove that the employer's stated reasons are pretextual in order to succeed in showing disparate treatment because of race. *Id.*  "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)).

1.      **The *prima facie* case**

Neither party disputes that Logan, an African-American, is a member of a protected class.  Similarly, neither party disputes that Logan's termination in February 2011 constitutes an adverse employment action.  However, the parties dispute whether Logan was meeting Sabre's

legitimate performance expectations. The parties also dispute whether Timothy Sebesta, Jesse Jewell, Mike Conner, and Lars Gustafson were similarly situated employees such that Sabre's more favorable treatment of them would prove the fourth element of Logan's *prima facie* case of race discrimination and retaliation. The Court will address the disputed elements separately below.

**a.** **Meeting Employer's Legitimate Expectations**

In determining whether a terminated employee was meeting the employer's legitimate expectations, the issue is not the employee's past performance, but whether the employee was performing well at the time of the adverse employment action. *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009); *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002). Logan acknowledges this legal standard, but pleads with the Court to consider the negative impact of the alleged hostile work environment on his work when analyzing whether he was meeting Sabre's expectations. In particular, Logan suggests that his performance deficiencies can be attributed to distraction, inattention to detail, and inability to concentrate caused directly by the alleged harassment and not because he lacked skills or competency as a welder.

Title VII prohibits employers from discriminating or retaliating against employees based on race assuming they are meeting the employer's legitimate performance expectations. The record is clear that Logan did not meet Sabre's expectations over the course of the 90-day assignment and was not meeting Sabre's expectations in February 2011 when he was terminated. As part of their 90-day review of Logan's work, Production Manager Hurt, Quality Control Managers James and Bruce, and Second Shift Supervisor Rose all concluded that Logan's work was deficient. They based their conclusion on Rose's termination report showing unsatisfactory

performance in attendance, initiative, job knowledge, quality of work, dependability, work safety, and management skills and fair performance in cooperation and job productivity. The same report noted that all four of them had worked with Logan to improve his weld quality, but that Logan either could not or chose not to listen and improve. Doc. No. 25-7.

Rose's termination report also followed three warnings and a 45-day evaluation documenting Logan's poor work quality starting with Supervisor Doty's verbal warning about bad welds on December 17, 2010. *See* Doc. No. 20-2 at 17. In the 45-day evaluation on January 3, 2011, Manager Hurt noted that Logan was meeting expectations only in the areas of following company rules and policies, being present and on time, treating coworkers with respect, and willingly working with others. *Id.* at 16. Hurt also included a handwritten note advising Logan to "pick up his game," or in other words to improve his performance, or "he won't be here much longer," implying that he was at risk of losing his job. *Id.* At that mid-point of his temporary assignment, Logan earned 86 points equating to "poor job performance." *Id.*

Shortly thereafter on January 7, 2011, Doty issued a written warning to Logan noting his poor job performance, violations of company procedure, and for walking around doing nothing while on the job. Doc. No. 20-2 at 18. Logan received his third warning on February 8, 2011, just two days before Rose's termination report, because he had rushed his work that night creating errors requiring substantial time and human resources to repair. Doc. No. 20-2 at 20; 27-1 at ¶ 4.

Logan never challenged any of the four warnings. He has since acknowledged that his work was of less than perfect quality, but argues that the alleged hostile work environment at Sabre should excuse his poor performance. In making this argument, Logan admits that his work

performance was not meeting Sabre's expectations at the time he was terminated. As such, no reasonable trier of fact could conclude that Logan was meeting Sabre's expectations.

Moreover, Logan's argument for a lenient interpretation of this element of the *prima facie* case is a non-starter. To find that Logan was meeting his employer's expectations would require a determination that the alleged hostile work environment constituted an adverse employment action and that Logan was meeting Sabre's expectations when the hostile work environment began. In support, Logan cites Hurt's testimony that Logan was performing well during his first couple weeks at Sabre and his own belief that the comments and conduct of his co-workers and a supervisor distracted him from his work negatively affecting his work performance. However, Logan did not cite any legal authority for his proposed interpretation of this element. Therefore, Logan has established that his termination, not the hostile work environment, constituted an adverse employment action under Title VII.

Moreover, the law is clear that the quality of Logan's performance at the time of the adverse employment action counts. *See Dear*, 578 F.3d at 610; *Peele*, 288 F.3d at 329. Logan has presented no authority to suggest otherwise. Because Logan was not meeting Sabre's expectations when he was terminated, there is insufficient evidence upon which a reasonable jury could conclude that Logan established the expectations element of his *prima facie* case of race discrimination and retaliation.

**b.      Treatment of Similarly Situated Employees Not in the Protected Class**

Even if the Court concluded that Logan had satisfied his employer's expectations, Logan's claims would still fail because he cannot establish the similarly situated element of the *prima facie* cases of race discrimination and retaliation. Comparator evidence showing more

favorable treatment of similarly situated employees not in the protected class suggests that an accused employer either unlawfully discriminated against the protected employee or did not enforce its own rules or policies on discrimination even-handedly sufficient to support an inference of intentional discrimination. *See Coleman v. Donohoe*, 667 F.3d 835, 846, 853 (7th Cir. 2012). "The similarly-situated analysis calls for a flexible, common-sense examination of all relevant factors." *Id.* at 846 (quotations and citations omitted). The analysis is intended to eliminate all potential variables besides discriminatory animus to explain unequal or disparate treatment of employees. *Id.* Yet the court's function is not "to question an employer's decision to punish some conduct more harshly than other conduct" but to scrutinize how even-handedly an employer applies its policies and expectations. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 891 (7th Cir. 1991).

To be effective, the analysis must consider employees who are directly comparable to the plaintiff in all material respects. *Coleman*, 667 F.3d at 846. Yet similarly situated employees need not be identical in every conceivable way. *Id.* The analysis must consider enough factors to show that the employees are similar enough to the plaintiff to permit a reasonable inference of discrimination. *Id.* at 852. While there is no all-inclusive list of factors to consider, courts often consider whether the employees and the plaintiff (1) dealt with the same supervisor; (2) were subject to the same standards of conduct; and (3) engaged in conduct of comparable seriousness. *Id.* at 847–52.

Here, Logan identifies Timothy Sebesta, Jesse Jewell, Mike Conner, and Lars Gustafson as similarly situated employees who Sabre treated more favorably than him. Indeed, all four worked in the same unit with the same job classification subject to the same supervisors. Logan

contends that they were all written up on one or more occasions for subpar work performance that slowed productivity or led to leaky tanks just like Logan. However, Logan argues that all four were treated more favorably than him because Sabre allowed them to continue working at Sabre considerably beyond the 90-day temporary assignment, which gave them more time than Logan had to improve their performance and develop their skills.

Sabre admits that all four worked at Sabre longer than Logan. Sabre also admits that all four received job performance warnings like Logan did. However, Sabre shows that none of the four had the same volume or types of warnings as Logan during their 90-day temporary assignment. Their warnings accumulated after becoming permanent Sabre employees. As a result, no reasonable jury would conclude that Sebesta, Jewell, Conner, and Gustafson were directly comparable to Logan in all material respects. *See Coleman*, 667 F.3d at 846. Therefore, there is insufficient evidence to show that Logan's four co-workers were similarly situated to him to create a genuine issue of material fact as to the similarly situated element of Logan's *prima facie* cases of race discrimination and retaliation.

### 2. Pretext

Because Logan has not established any genuine issue of material fact as to whether he was meeting Sabre's expectations at the time he was terminated and whether his four co-workers, who were allegedly treated more favorably than him, were similarly situated, Logan has presented a factual record that could not lead a reasonable jury to conclude that he met his burden to establish a *prima facie* case of intentional race discrimination and retaliation under Title VII. However, even making all inferences in favor of Logan and assuming that he did establish his *prima facie* case, his claims still fail because he has not established any genuine

issue of material fact as to pretext.

Sabre has offered a legitimate, nondiscriminatory reason for terminating Logan or refusing to give him a permanent job following his 90-day temporary assignment from the employment agency. It claims that his work performance during the 90-day assignment was poor and that the company's efforts to provide additional training had not yielded improved performance. Therefore, Logan must show that Sabre's articulated reason is pretextual, in short that the stated reason of poor performance is a lie.

Pretext "means a lie, specifically a phony reason for some action." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (quoting *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995)). When an employer's articulated reason is unacceptable work performance, the dispositive question is whether the employer's decision makers honestly believed that the employee was terminated because of unacceptable work performance. *Coleman*, 667 F.3d at 852. To establish pretext, the employee must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the articulated reason "that a reasonable person could find [it] unworthy of credence" and infer that the employer did not act for the articulated nondiscriminatory reason. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). Pretext will not be found even if a decision maker had discriminatory thoughts in mind when making the termination decision as long as the articulated reason, such as poor work performance, induced him to take the adverse action. *Coleman*, 667 F.3d at 853.

Logan has simply not established pretext. Logan discusses many facts in his summary judgment brief. But when discussing pretext, he simply states that he "has, and can, offered a set of facts would seem to indicate that SABRE's actions are in fact pretextual." Doc. No. 24 at 25.

He does not direct the Court's attention to any specific facts. Nor does any part of his brief address the honest belief of Hurt, James, Bruce, and Rose—the Sabre managers and supervisors who made the decision to terminate Logan—that Logan was not performing up to company expectations. He makes no argument that the termination contradicted or was inconsistent with his performance. He does not even challenge any of the warnings that were issued during the 90-day assignment as discriminatory or retaliatory. Moreover, Logan actually defeats any argument of pretext by admitting that his work performance was deficient as part of his theory that the alleged hostile work environment affected his work performance and caused his termination.

Therefore, Logan's racial discrimination and retaliation claims cannot succeed under the indirect method. Even allowing for the unlikely possibility that Logan has established a genuine issue of material fact as to his *prima facie* case, he has failed produce evidence sufficient for a reasonable jury to conclude that Sabre's legitimate, nondiscriminatory reason for terminating him was pretextual. Moreover, any disputes of fact between the parties that do exist are not sufficiently material to allow Logan's race discrimination and retaliation claims to proceed to a jury.

> **D.** **Logan cannot establish employer liability and therefore his hostile work environment claim fails as a matter of law.**

Title VII provides that it "shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e–2(a)(1). An employer may be liable for discrimination under Title VII if an employee is subject to a hostile work environment based

on his race.  *Mason v. S. Illinois Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000).

To succeed on a hostile work environment claim, an employee must show that:  (1) he was subject to unwelcome harassment that was offensive both subjectively and objectively; (2) the harassment was based on his race; (3) the harassment was severe and pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; (4) there is a basis for employer liability.  *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011); *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 634 (7th Cir. 2009).  In evaluating a hostile work environment claim, the court "must consider the entire context of the workplace" rather than focusing on discrete acts of individual employees.  *Vance v. Ball State Univ.*, 646 F.3d 461, 470–71 (7th Cir. 2011).  Moreover, courts "will not find a hostile work environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating."  *Yancick*, 653 F.3d at 544.  Conduct must be extreme to amount to a change in the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Based on the factual record as a whole, Logan has not established any genuine issue of material fact as to whether the alleged harassing conduct of his co-workers and supervisors was objectively offensive to him.  By choosing not to report all the allegedly race-based conduct and language that he encountered, Logan demonstrated that he was not sufficiently bothered by it to be offended.   Logan has also failed to present a genuine issue of material fact as to whether all the language and conduct alleged by Logan would be objectively offensive to other reasonable people.  Even conceding that the Trigg/Pachowicz, graffiti, and swastika incidents would likely be viewed as offensive, the comments and stories, like those of Lars and Johnny, could

reasonably be perceived as jokes, isolated statements of opinion, or even friendly warnings.

Furthermore, Logan has not produced sufficient evidence upon which a reasonable jury could conclude that the alleged harassing language and conduct at Sabre was so severe or pervasive that it altered the conditions of Logan's employment. There is no doubt that the Trigg/Pachowicz incident was physically threatening and humiliating, but a single incident does not constitute the severity or frequency of harassing conduct necessary to satisfy this element. More importantly, Logan has not shown that the race-based language and conduct altered the conditions of his employment at Sabre or interfered with his ability to work. His own conflicting testimony exposes his weak argument.

Yet the Court must construe the facts in a light most favorable to Logan. Nevertheless, any factual disputes that do exist regarding the subjective, objective, and severe or pervasive elements of Logan's hostile work environment claim are not material because Logan cannot establish any basis for employer liability. "[A]n employer can avoid liability for coworker harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Porter*, 476 F.3d at 636 (quotations and citations omitted). "[A] prompt investigation is the hallmark of a reasonable corrective action." *Id.* (quotations and citations omitted). In other words, the employee must show that the employer negligently failed to prevent and correct reported harassment promptly in order to establish a basis for employer liability for co-worker harassment under Title VII. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998). The employee also has a responsibility to mitigate his damages and must avail himself of the remedies to harassment made available by the employer. *Penn. State Police v. Suders*, 542 U.S. 129, 146 (2004); *Faragher*, 524 U.S. at 807.

While an employer is liable for a hostile work environment created by the conduct of a supervisor if the supervisor has immediate, or successively higher, authority over the employee, the employer may avoid such liability through an affirmative defense proving that "(a) . . . the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) . . . the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807.

Logan's argument here fails because Sabre addressed all the racially charged issues that Logan reported and several that he did not. First, Sabre should be commended because it maintained an anti-discrimination and anti-harassment policy ("the Company Policy") that it promoted to all of its employees, including the temporary employees like Logan, who were required to read and sign an acknowledgment of receipt of the policy when they were hired. Logan admits that he received the policy, signed the acknowledgment form, and even heard management state often that discrimination and harassment would not be tolerated at Sabre. In addition, Sabre displayed posters advising employees of their right to work in an environment free of unlawful discrimination and harassment. All employees were encouraged to report any incidents of concern they observed, but the managers and supervisors were especially encouraged to remain vigilant and report any suspicious conduct to Production Manager Hurt, Human Resources Manager Craig, or Plant Manager Ries. And Ries even advised Logan individually after the Trigg/Pachowicz incident to report any offensive conduct to him directly or to Craig in human resources.

Second, the system appears to have worked in that numerous complaints were

consistently investigated and addressed. For instance, Logan did not even have to report the Trigg/Pachowicz incident himself because Rose, the Second Shift Supervisor, reported it directly to Hurt the morning immediately after the night of the event. From there, Hurt and Ries immediately conducted interviews to determine what had happened and within two working days, both Trigg and Pachowicz were fired. The parties dispute the actual rationale for the terminations. Even if reasons unrelated to race-based discrimination and harassment were involved in the decision, the company still handled the situation promptly so as to prevent any repetition of such conduct by Trigg or Pachowicz specifically and deter such conduct by other employees. Similarly, Logan did not have to report the graffiti incident himself because management was promptly made aware of the problem and removed it. These examples show that the company not only had a policy, but they laudably and regularly enforced it promptly when faced with discriminatory or harassing situations.

Of course, just because Sabre enforced the Company Policy in these instances does not automatically preclude liability. Sabre could have selectively enforced its policy by addressing certain situations and refusing to address others. Logan, however, failed to inform Sabre of all the incidents against him as required under the Company Policy. For instance, Logan admits that he never reported Hurt's racial slurs to upper management. In addition, Logan has provided no evidence to support his contention that he reported the Lars and Johnny conversations to Sabre management. His Sabre personnel file does not document any such report and he cannot even recall when he allegedly reported the conversations to Craig.

Without such evidence, the Court is left with Sabre, an employer that had a company policy against discrimination and harassment based on race, actively promoted that policy,

promptly investigated incidents, and enforced its policy with corrective actions. As Logan admits, Sabre even addressed some incidents that were not directed specifically at him or reported by him.

In contrast, Logan admits that he did not report incidents of which he now complains. Moreover, he has not provided sufficient evidence to corroborate his vague claim that he reported other incidents that Sabre did not address. In short, Logan benefitted from the corrective action of Sabre and was personally advised to take full advantage of the Policy, but failed to do so. As such, Logan cannot establish that Sabre negligently failed to prevent and correct reported harassment promptly. The Court also finds that Logan unreasonably failed to fulfill his responsibility to mitigate his damages and avail himself of the preventive and corrective remedies to harassment made available by Sabre through the Company Policy. Therefore, no reasonable jury could conclude that any basis existed for Sabre to be held liable for hostile work environment based on co-worker or supervisor conduct under Title VII.

IV.    CONCLUSION

Because there are no genuine disputes of material fact and Logan cannot establish his claims of race discrimination, retaliation, or hostile work environment under Title VII, Sabre is entitled to judgment as a matter of law on those claims. Moreover, Logan has conceded that his First Amendment cannot succeed. Therefore, the Court now **GRANTS** Sabre's motion for summary judgment. [Doc. No. 18]. The Clerk is instructed to enter judgment for Sabre on all claims.

**SO ORDERED.**

Dated this 8th Day of October, 2013.

 S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge
